# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CRIMINAL ACTION 1:11-00122-KD-C |
| ) | |
| JAVIER RAMON RODRIGUEZ, ) | |
| ) | |
| Defendant. ) | |

## ORDER

This action is before the Court on the defendant Javier Ramon Rodriguez's Motion to Suppress (Doc. 38) and the response filed by the Government (Doc. 40). An evidentiary hearing with oral argument was held on July 1, 2011, and the parties have submitted additional briefing in the matter pursuant to the Court's oral order at the hearing (Docs. 48, 53). Upon consideration of the motion, response, supplemental briefing and evidence presented at the hearing, and for the reasons set forth herein, the motion to suppress (Doc. 38) is due to be **GRANTED** as to the wallet and to any statement made by Rodriguez and **DENIED** as to the remaining items found during the search.

I.  Findings of Fact

Joshua Rhodes ("Rhodes") is a deputy with the Mobile County Sheriff's office who has served as such for two-and-a-half or three years. (Suppression Hearing Transcript ("SHT"), p. 3). As a sheriff's deputy, his duties include interstate interdiction, which involves attempting to catch criminals traveling on the interstate with contraband. (Id., pp. 4-5). Previously, Rhodes worked for three years with the City of Mobile police department, during which he participated in "hundreds or thousands" of traffic stops. (Id., pp. 3-4).

On May 6, 2011, Rhodes, who was traveling alone in his marked patrol car on Interstate 10, came upon a red GMC Sierra towing a white Hyundai. (Id., pp. 5, 8, 38; Gov't's Exh. C). Rhodes observed that the Sierra was following too closely to the vehicle in front of it. (SHT, p. 5). He pulled up behind the Sierra, ran its tag and found it was registered to the vehicle, indicating it was not stolen. (Id., pp. 5-6, 60). During the five to ten seconds it took for Rhodes to run the tag, the Sierra continued to follow too closely, at a distance estimated by Rhodes to be around forty feet, maintaining the same speed as the car it was following. (Id., pp. 60-62).

Pursuant to Alabama Code § 32-5A-89, which makes it a traffic violation for a driver to follow a vehicle too closely, (Gov't's Exh. B), Rhodes stopped the Sierra. To avoid the danger posed by oncoming interstate traffic, Rhodes approached the Sierra on the passenger side. (SHT, pp. 7-8). At the time of the stop, Rhodes was in uniform and carrying a gun. (Id., pp. 37-38). The windows of the vehicle were down, and Rhodes noted that it was occupied by two males: Defendants Pedro Lamela-Cardenas ("Lamela"), who was the driver of the vehicle, and Javier Ramon Rodriguez ("Rodriguez"). (Id., pp. 8-9). Lamela is a native of Cuba who lives in Miami, Florida, and claims not to speak English. (Id., pp. 156-57).

Upon approaching the vehicle, Rhodes first noticed that Rodriguez was acting very nervous. (Id., p. 9). Rhodes "could literally see his heart beating in his chest through his clothes and his neck[,]" and he was shaking. (Id., pp. 9-10). To Rhodes, Rodriguez appeared more nervous than was normal for the circumstances. (Id., p. 10). Rhodes asked both men for their identification. (Id.). At all times relevant to this matter, Rhodes verbally addressed Lamela and Rodriguez in English, as he does not speak Spanish. (Id. at pp. 10, 16, 25, 44-45). Both men complied without giving any indication that they didn't understand. (Id., pp. 10-11). Lamela claims, however, that he already had his license in hand before Rhodes asked for it. (Id., p.

174).

Rodriguez had taken his identification out of his wallet, which Rhodes observed him retrieve from his back pocket. (Id., pp. 12-13, 53-54). After handing Rhodes his identification, Rodriguez set his wallet down on the Sierra's center console. (Id., p. 13, 54). Rodriguez continued to act nervous, so Rhodes asked him to step out of the car. (Id., p. 13). Rodriguez complied though he appeared "[a] little scared, a little angry" with the request. (Id., pp. 13-14). At this point, Deputy Richard Sorrell ("Sorrell"), who had been following behind Rhodes when he made the stop, had pulled up behind Rhodes' vehicle and was approaching the scene. (Id., pp. 14, 81, 95). Rhodes had Sorrell take Rodriguez back to his vehicle in order to separate the two men for safety reasons. (Id., pp. 14-15). While with Sorrell, Rodriguez stood with his back to Rhodes and the Sierra and did not see or hear Rhodes' further interaction with Lamela. (Id., pp. 15, 56).

Rhodes then asked Lamela, the driver, from where he was coming and where he was going. (Id., pp. 15-16). Appearing to understand Rhodes, Lamela responded in broken English that he was coming from Louisiana and was going to Florida. (Id., p. 16). The two men had gone to Louisiana to tow a car they had purchased. (Id., p. 158). Rhodes then asked Lamela for permission to search the vehicle, moving his arms in a circular motion inside the vehicle to indicate the area he wished to search. (Id., pp. 16-17). At this point, about a minute or two had passed since Rhodes had pulled the Sierra over. (Id., pp. 24-25). Lamela acted like he did not understand the request, so Rhodes produced a copy of Spanish for Law Enforcement from his pocket. (Id., p. 17). Turning to page 205 of the book, Rhodes pointed out to Lamela the last two lines on the page, the first line containing the phrase "May I search your car?" and the second line containing its Spanish equivalent, "¿Me da permiso para registrar su coche?" (Id., pp. 18-

3

20; Gov't's Exh. D). Because Lamela was still in the driver's seat, and because Rhodes was still standing on the passenger side, Rhodes had to reach through the open passenger door and across the interior of the Sierra to show Lamela the page. (SHT, pp. 46-47). After being shown the page, Lamela then said yes. (SHT, p. 20).

Upon commencing his search, Rhodes first turned his attention to the wallet Rodriguez had left on the center console, as he felt that Rodriguez might have been trying to hide something by leaving it there. (Id., pp. 20-21, 63-64). In the wallet, Rhodes found a Louisiana identification card that had a picture of Rodriguez on it but was in the name of "Josh Johnson." (Id., pp. 72-73; Doc. 34-1 at 2). After searching the wallet, Rhodes searched the center console of the vehicle, where he found a bundle of credit cards and gift cards hidden under the cup holder, some of which were in the name of "Josh Johnson." (SHT, pp. 22, 72-73, 177; Doc. 34-1 at 2). Rhodes then searched a gym bag behind the passenger seat, in which he found a jacket which contained several more cards, all also in the name of "Josh Johnson." (SHT, pp. 23, 46, 74). After searching the jacket, Rhodes ceased searching the Sierra further at that time. (Id., p. 23). Throughout the search conducted on the side of the interstate, Lamela remained in the Sierra and never indicated that he wished the search to stop. (Id., pp. 20, 22-24, 180). In addition, Rhodes was never made aware of who owned the gym bag, and the only identification found in it was the cards in the name of "Josh Johnson." (Id., pp. 58-59).

Rhodes then asked Lamela to follow him to a substation in Theodore. (Id., p. 25, 106). In English and without hesitation, Lamela said okay. (Id.). Lamela followed Rhodes to the substation. (Id., p. 26). Sorrell brought up the rear, carrying Rodriguez in his vehicle. (Id.). Before they left for the substation, Rhodes signaled Sorrell to handcuff Rodriguez for safety reasons. (Id., pp. 27-28, 84). Sorrell complied with the order. (Id., pp. 84, 98). At this point,

4

neither Lamela nor Rodriguez had been placed under arrest by the deputies. (Id., p. 28).

The deputies and the two defendants arrived at the substation without incident, and the defendants were brought inside. (Id., pp. 29-30). Rhodes printed and filled out two forms asking permission to search a vehicle, one for the Sierra and one for the Hyundai being towed. (Id., p. 30). Rhodes explained the permission forms to Lamela, who appeared to understand them and signed both, though he claims he thought the forms were for permission to move his car. (Id., pp. 30-31, 183-84; Gov't's Exh. A). Rhodes proceeded to conduct a further search of the two vehicles on the premises. (SHT, p. 32). The search of the Sierra by Rhodes and another deputy yielded a number of other credit and gift cards hidden beneath the dashboard and under the carpet, on both the driver and passenger sides. (Id., pp. 75-78, 127-28).

Chris Graham ("Graham"), a United States Secret Service agent, was called to the substation and brought a card-reading device with him. (Id., pp. 120-21). Graham used the device to scan the magnetic strips of the credit cards to see what was on them. (Id., p. 121). Graham estimates he examined forty or more credit cards. (Id., p. 122). Some of the credit cards had nothing encoded on them, some had encoded information that matched the numbers embossed on them, and some were encoded with numbers different from those embossed on them. (Id.). Each credit card was also embossed with the name of either "Josh Johnson," "Javier Rodriguez," and "Pedro Lamela-Cardenas." (Id., pp. 122-23). Graham concluded that a majority of the credit cards were counterfeit. (Id., p. 123). Graham was also presented with fifty or more gift cards. (Id., p. 125). After examining the cards, Graham interviewed Lamela using a Spanish-speaking ICE agent, asking him about what was found in the Sierra. (Id., pp. 134-36). The ICE agent would wait until Graham had finished speaking to translate his words, though Lamela would nod his head while Graham was still speaking English. (Id., pp. 135-36).

5

Lamela, however, remained silent during Graham's questioning. (Id., p. 183).

Upon arriving at the substation, Sorrell sat Rodriguez at a conference table in the substation, then placed him in a cell about fifteen minutes later. ((Id., pp. 84-85). About forty-five minutes later, Sorrell and Immigration and Customs Enforcement (ICE) Agent Matthew Chakwin ("Chakwin") retrieved Rodriguez and sat him back at a table, where Chakwin introduced himself, said he wanted to talk with him, and read him his Miranda rights from a form waiver. (Id., pp. 85-87, 108-09; Gov't's Exh. 1). Chakwin asked Rodriguez to sign the waiver. (SHT, p. 111). Rodriguez said he did not want to sign the Miranda form but told Chakwin he would talk with him. (Id., p. 110). Chakwin reiterated that he had read Rodriguez his Miranda rights and asked him if he wanted to answer his questions. (Id., p. 111). Rodriguez responded that he did not have a problem with talking to Chakwin. (Id.).

Chakwin then proceeded to question Rodriguez for about ten to twenty minutes, with Rodriguez willingly providing responses. (Id., pp. 91-92, 111). Rodriguez was then returned to his cell. (Id., p. 92). Rodriguez was removed from his cell and questioned by Chakwin twice more after that. (Id., pp. 92-93, 112-16). In all, the questioning spanned a period of about an hour and a half. (Id., p. 94). Whenever questioned about the cards found in the Sierra, Rodriguez denied having any knowledge of them. (Id., pp. 117-18). Rodriguez never indicated to the officers during questioning that he did not wish to talk to them, and no coercion was used to get him to talk. (Id., pp. 93-94, 114, 116).

After the search at the substation, Rhodes issued Lamela a citation, about an hour and a half having passed since the initial stop. (SHT, pp. 32, 62; Gov't's Exh. C). The citation was translated to Lamela in Spanish and he signed it. (Id., pp. 185-86). The decision was made to impound the vehicles, and both defendants were placed under arrest for trafficking in stolen

6

identities and criminal possession of a forged instrument. (SHT, pp. 35-36). At the time, Rodriguez was on probation in Florida for credit card fraud. (Doc. 34-1 at 2). It is the policy of the Mobile County Sheriff's office to conduct an inventory search of vehicles upon impound. (SHT, p. 35).

Lamela denies he conversed with Rhodes in English, that he understood Rhodes' request for permission to search his vehicle, or that he gave consent to search the vehicle. (Id., pp. 161-62, 175-76). He also claims that Rhodes never showed him a book during the stop. (Id., p. 164). When shown the page Rhodes claimed he had pointed out to him, Lamela claimed that the Spanish phrase asking for permission to search his car was incorrect but that he could understand what was requested. (Id., p. 167; Gov't's Exh. D).

II. Arguments

Rodriguez moves to suppress "any identification card, credit card, gift card, counterfeit access device or any other physical evidence seized" from his wallet or gym bag and "any and all statements, answers, or responses" made by Rodriguez during his alleged unlawful detention because there was no warrant, no consent, and no reasonable suspicion. (Doc. 38). Specifically, Rodriguez argues that he was not asked for consent to search his wallet or bag, that he never gave such consent, and that Rhodes searched his wallet and bag after he had exited the truck. Rodriguez argues that the physical conditions identified by Rhodes - that Rodriguez was breathing heavily with a visible pulse - were not sufficient specific and articulable facts to warrant converting the traffic stop into a detention and investigation for another non-traffic offense, but instead the stop was based on a hunch or an unparticularized suspicion. (Doc. 38).

The Government responds that while Rodriguez's demeanor caused Rhodes to take safety precautions, his demeanor was not the basis for the search, but instead Lamela's consent allowed

7

the search. The Government argues that when Rodriguez left his wallet on the console, he no longer had a legitimate expectation of privacy under these circumstances and thus, when the Deputy obtained consent to search, it was reasonable that the search would include the wallet, as well as the bag. The Government also argues that the contents of the wallet would have inevitably been discovered during the inventory search or Rodriguez's arrest. Finally, the Government argues that Rodriguez was read his *Miranda* rights, acknowledged that he understood, answered the officers' questions, even though he would not sign the *Miranda* rights form. (Docs. 40, 48).

III. Analysis

    A. *Evidence from Rodriguez's wallet & gym bag*

        1. Lamela's Consent

" [C]ontraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant where probable cause exists . . . If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Wyoming v. Houghton, 526 U.S. 295, 300-01 (1999) (internal quotations omitted). The Government argues that Rodriguez's nervousness during the traffic stop, his acting "scared" and "angry" when asked to exit the vehicle, and his leaving his wallet behind without being told to provide "independent probable cause to search the wallet." (Doc. 48 at 9). The Government cites no authority to support this contention, and the Court is not convinced that, "under the totality of the circumstances," there was "a fair probability that contraband or evidence of a crime w[ould] be found" in the wallet at the time it was searched. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005).

    Another possible justification for the warrantless search of Rodriguez's belongings is

Lamela's consent to the search of the Sierra, given verbally on the side of the interstate. As the Court has found in a separate Order issued contemporaneously and addressing Lamela's Motion to Suppress (Doc. 34), Lamela's verbal consent to search the Sierra was valid. Rodriguez claims, however, that Lamela's consent to a search of the Sierra did not give Rhodes authority to search Rodriguez's wallet, which he left on the vehicle's center console before getting out of the vehicle at Rhodes' direction, or his gym bag, which was found in the back seat. The Court agrees.

> The Eleventh Circuit has held:
>
> Third parties may consent to searches when they possess "common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242 (1974). The Supreme Court has explained that:
>
>> the authority which justifies the third-party consent does not rest upon the law of property. . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
>
> Id. at 172 n.7, 94 S. Ct. at 993 n.7 (internal quotations and citations omitted). Moreover, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained valid consent to search the area." United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997).

United States v. Camp, 157 F. App'x 121, 123 (11th Cir. 2005).

"The determination of whether officers reasonably believed that an individual possessed authority to consent to a search 'must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" United States v. Hyatt, 383 F. App'x 900,

906 (11th Cir. 2010) (quoting United States v. Mercer, 541 F.3d. 1070, 1074 (11th Cir. 2008)). In support of his argument, Rodriguez cites (without providing any analysis) United States v. Cantu, No. 10-50313, 2011 WL 1899490, 2011 U.S. App. LEXIS 10219 (5th Cir. May 19, 2011) (unpublished). In that case, the defendant, Maria Cantu, was riding as a passenger in a vehicle driven by Jose Aguilar. A deputy sheriff pulled the vehicle over for several perceived traffic violations. While being questioned, Cantu told the deputy that the vehicle was Aguilar's. Aguilar then consented to a search of the vehicle. The deputy observed two closed bags on the floor near the passenger seat, one of which appeared to be a purse. The deputy asked Cantu if the bags belonged to her, and she confirmed that they did. Without asking for Cantu's permission, the deputy began searching the bags, with no objection from Cantu. Marijuana was found in the bags, with cocaine being found elsewhere in the vehicle. Id. at WL *1, LEXIS *1-4.

Applying United States v. Jaras, 86 F.3d 383 (5th Cir. 1996), the district court ruled that the search of Cantu's bags violated the Fourth Amendment and suppressed the marijuana found there. The Fifth Circuit affirmed this finding, holding that Jaras applied to the search at issue:

> In Jaras, police received consent for a search from the driver of a vehicle, leading them to two suitcases in the trunk. The driver told the officers that the suitcases belonged to his passenger, Jaras. The officers told Jaras that they had permission from the driver to search the car, then proceeded to open the suitcases, with Jaras neither consenting nor specifically objecting to the search. We held that the search of Jaras's suitcases violated the Fourth Amendment because the driver had neither actual nor apparent authority to consent to a search of his passenger's property and because Jaras's "mere acquiescence" could not be construed as voluntary consent when officers never asked for his permission.
>
> The Government argues that the search was permissible under United States v. Navarro,[ 169 F.3d 228 (5th Cir. 1999),] but Navarro is distinguishable. In that case, as in Jaras, a driver consented to a search of his vehicle, which contained a closed duffle bag on the back seat. Unaware that the duffle bag belonged to a passenger, police opened the bag and found methamphetamine. We distinguished Jaras and allowed the contents of Navarro's duffle bag to be admitted because the officers in Navarro had "no indication" that the bag belonged to someone other than the driver.

10

> Deputy Rios knew that the bags he found belonged to Cantu, not the driver. She told him so. While the officers in Navarro may have reasonably believed that the duffle bag belonged to the consenting driver, the officer here—like the officers in Jaras—knew the closed bags belonged to a passenger who had not given consent. The district court correctly ruled that the search of Cantu's bags was unconstitutional.
>
> The government further argues that, even if the search was illegal, it was not particularly flagrant. We disagree. There is nothing unclear about Jaras, which has been the law of this circuit for almost 15 years. Deputy Rios had no authority to search inside Cantu's closed bags without her consent, which he neither sought nor obtained. And he knew the bags he was searching were hers.

Cantu, 2011 WL 1899490, at *3-4, 2011 U.S. App. LEXIS 10219, at *9-11 (footnotes omitted).

See also United States v. Jackson, 598 F.3d 340, 347 (7th Cir. 2010) ("For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents. Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property." (internal citations and quotations omitted)).

The Court finds the reasoning of Cantu and Jaras persuasive on this issue. In the present case, Rhodes knew, or should have reasonably believed, that the wallet on the Sierra's center console belonged to Rodriguez and that Lamela had neither actual nor apparent authority to consent to its search. Though he was never explicitly informed that it was Rodriguez's wallet, Rhodes observed Rodriguez pull the wallet from his back pocket and produce his identification from it at the beginning of the traffic stop. He then observed Rodriguez set the wallet down on the console, where it remained until Rhodes searched it (a period of mere minutes). No evidence has been presented showing that Lamela had any interaction with the wallet after Rodriguez set it

down, nor is there evidence that shows, or at least would have given Rhodes the impression, that Lamela and Rodriguez shared access to or control of the wallet. Other courts have reached similar conclusions regarding searches of a passenger's possessions pursuant to a driver's consent when officers knew or reasonably should have believed that the driver did not have ownership of them.[1]

Such is not the case with the gym bag found in the back seat of the Sierra. Unlike with the wallet, the search of the gym bag occurred under conditions much like those the Fifth Circuit described in <u>Navarro</u>, <u>supra</u>. Rhodes had no indication of to whom the bag belonged when he searched it. Lamela made no effort to stop Rhodes from searching the bag or inform him that it

---

[1] See <u>United States v. Infante-Ruiz</u>, 13 F.3d 498, 505 (1st Cir. 1994) ("What leads us to hold that the scope of [driver] de la Paz's consent did not include [passenger] defendant's briefcase, is that de la Paz's general permission to search the car and its trunk was qualified by de la Paz's further statement to the officer, before the latter opened and searched the briefcase, that the briefcase belonged to Infante. Even though Infante was nearby, handcuffed in the squad car, the police officers never sought his permission to search his briefcase."); <u>United States v. Welch</u>, 4 F.3d 761, 764-65 (9th Cir. 1993), <u>overruled on other grounds by</u> <u>United States v. Kim</u>, 105 F.3d 1579 (9th Cir. 1997) (male driver had neither actual nor apparent authority to consent to search of female passenger's purse in trunk); <u>United States v. Hephner</u>, 260 F. Supp. 2d 763, 773-76 (N.D. Iowa 2003) (driver of truck had neither actual nor apparent authority to consent to search of passenger's toolbox in the truck bed when officers knew the toolbox belonged to the passenger and no evidence indicated driver had joint control or access) (On appeal, the Eighth Circuit found that the issue of consent to search the toolbox became irrelevant after a drug dog's alert provided probable cause to search the truck. See <u>United States v. Hephner</u>, 103 F. App'x 41, 47 (8th Cir. 2004)); <u>Stokvis v. State</u>, 147 S.W.3d 669, 672 (Tex. App. 2004) ("[S]ince the State failed to prove here that [driver] Shorty had a legitimate privacy interest in, exercised equal control over, or had the authority to jointly use the [defendant passenger's] purse, the officers could not use his consent to justify their search of it."); <u>Brown v. State</u>, 789 So. 2d 1021, 1022 (Fla. Dist. Ct. App. 2001) ("[T]he narrow issue presented is whether an officer has a reasonable basis to conclude that a driver's consent to search a car includes a search inside a passenger's purse or fanny pack if the passenger leaves the item in the car when ordered by the police to get our of the car. We hold that the officer must inquire of the passenger before searching inside such a purse or fanny pack."); <u>State v. Friedel</u>, 714 N.E.2d 1231, 1238-43 (Ind. Ct. App. 1999) (male driver had neither actual nor apparent authority to consent to search of female passenger's purse left in vehicle); <u>People v. James</u>, 645 N.E.2d 195 (Ill. 1994) (Male driver's consent to search vehicle, in which all adult passengers were female, did not extend to purse found in vehicle. Officer should have ascertained to whom purse belonged before searching.)

belonged to Rodriguez. Rodriguez has presented no evidence that there was anything on the outside of the bag that would have indicated to Rhodes that it was his. The fact that it was found behind the passenger seat of the vehicle is not, by itself, a conclusive indicator of ownership. Rhodes was reasonable to believe, when presented with no indication to the contrary, that Lamela had ownership or at least sufficient control of the bag that would have allowed him to consent to its search. Other courts have also held that a search of a passenger's belongings pursuant to the driver's consent was valid when ownership of the belongings was not established until after the search occurred.[2]

The Government presents several theories in defense of the search of Rodriguez's wallet. First, the Government argues that Rodriguez abandoned his wallet by leaving it on the center console of the Sierra, destroying any reasonable expectation of privacy he may have had in it. (Doc. 48 at 8-10). "[T]he voluntary abandonment of evidence can remove the taint of an illegal stop or arrest[.]" United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982) (internal quotations omitted). "[I]n determining whether there has been an abandonment, the critical inquiry is whether the person prejudiced by the search voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search . . . In addition, events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time." United States v. Winchester, 916 F.2d 601, 603-04 (11th Cir. 1990) (internal quotations omitted).

---

[2] See United States v. Crain, 33 F.3d 480, 484-485 (5th Cir. 1994) (officer unaware of who owned bag when he searched it, "testified that the bag would have been within easy reach of all three passengers in the car."); United States v. Anderson, 859 F.2d 1171, 1174, 1176-77 (3d Cir. 1988) (officer searched bag in trunk, then received confirmation of passenger's ownership after asking him).

13

In Pirolli, the defendant was considered to have abandoned three bags when he threw them over his back-yard fence and said "I never saw them before in my life" when confronted with them. 673 F.2d at 1203-04 (11th Cir. 1982). In Winchester, a wanted fugitive was considered to have abandoned a cottage and all property within when he drove past a number of police officers and marked patrol cars in plain view when leaving the cottage, never returned, and later called the police to taunt them about a gun he'd left there. 916 F.2d at 603-04 (11th Cir. 1990). Neither of these cases is analogous to the situation at issue, and the Court finds no evidence that otherwise indicates that Rodriguez intended to give up his interest in his wallet simply by leaving it in the vehicle in which he was traveling.

Second, the Government cites to United States v. Bellina, 665 F.2d 1335 (4th Cir. 1981), which deals with the "plain view" doctrine rather than abandonment. While the wallet itself was left in plain view on the console, the fake identification, inside the wallet, was not. Therefore, the "plain view" doctrine does not apply to the fake identification.

Third, the Government claims that Rodriguez made Lamela a bailor of his wallet by leaving it on the center console, thereby giving Lamela apparent authority to consent to its search. (Doc. 48 at 10). In support, the Government cites to Rawlings v. Kentucky, 448 U.S. 98, 104-06 (1980), in which a defendant who claimed ownership of drugs found in woman's purse did not have standing to contest its search, and United States v. Patrick, 257 F. App'x 844 (6th Cir. 2007), in which:

> Patrick argues that she did have a legitimate expectation of privacy in the records that were taken by the IRS because the property owner was acting as a trustee or bailee. The same analysis of Patrick's expectation of privacy in the place where the records were stored applies if there was a trust or bailment. See, e.g., Rawlings v. Kentucky, 448 U.S. 98, 105-06, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (considered privacy expectations of narcotics' owner who had relinquished custody of drugs to another person's purse, i.e., the bailor, and found no legitimate expectation of privacy in said purse). The evidence is that Patrick left the records

14

behind when she was evicted. The property owner wanted Patrick and her brother to retrieve the records for his own convenience in clearing out the property so it could be sold. Patrick even admitted that the property owner could have thrown the records away and she would have no recourse. Thus, whatever duties Patrick seeks to impose on her former landlord in this case are so ill-defined that society would not be prepared to recognize that such "duties" give rise to a reasonable expectation of privacy.

Id. at 847.

These cases are easily distinguished from the present one, and no evidence has been presented to otherwise indicate that Rodriguez intended to relinquish control of his wallet to Lamela. Moreover, as Cantu and Jaras, supra, imply, a passenger does not surrender all expectation of privacy in a container during a traffic stop simply by leaving it in the car in which he is traveling.

      2.      Inevitable Discovery

The Government also relies on the doctrine of inevitable discovery. "Under the inevitable discovery exception, if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means, the evidence will be admissible." United States v. Virden, 488 F3d 1317, 1322 (11th Cir. 2007) To that end, the Government contends that, even without the fake identification recovered in Rodriguez's wallet, there was probable cause to arrest both defendants due to the number of credit cards found in the Sierra, the fraudulent nature of some of the cards[3], the fact that many of the cards were hidden throughout the vehicle, and the presence of cards that were not in the name of either defendant. As such, the Government contends that the Sierra would have been impounded and it and the

---

[3] The Court notes that the "fraudulent nature of the cards" was not established until the defendants were transported to the substation and Agent Graham examined the cards with a card reader. Thus, this evidence is not considered for determining whether probable cause existed to further detain Rodriguez.

15

wallet in it would have been searched pursuant to the Mobile County Sheriff's Office's standard inventory procedures.

However, to legitimize the search of the wallet on the basis of inevitable discovery the arrest as to Rodriguez must be based on evidence that was obtained in adherence to the Fourth Amendment.[4] Thus, at the time Rodriguez was seized the only evidence was the presence of a large number of credit cards, some of which were in the name of a person not present. These facts do not support probable cause to arrest Rodriguez for credit card fraud or to seize the vehicle. Thus, Rodriguez should have been free to leave with his wallet rather than transported in handcuffs to the substation. *Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985) ("[O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."); United States v. Virden, 488 F3d 1317, 1321 (11th Cir. 2007)("Furthermore, to effectuate this seizure [of the vehicle] the officers handcuffed Virden, and without formally arresting him, drove him to another location. Such a seizure exceeds the boundaries of a *Terry* stop.) In which case, any subsequent inventory of the vehicle would not have included Rodriguez' wallet.

B.   *Statements by Rodriguez during his detention*

Because the handcuffing and transportation to the substation of Rodriguez exceeded the bounds of a *Terry* stop, any statements made by Rodriguez while being illegally detained are suppressed.

---

[4] The incriminating evidence in the wallet was discovered in violation of Rodriguez' Fourth Amendment right to be free from an unreasonable search, thus it cannot be considered in the analysis.

IV.     Conclusion

For these reasons, it is **ORDERED** that Rodriguez's Motion to Suppress (Doc. 38) is **GRANTED** as to the wallet and statements made by Rodriguez at the substation, but denied as to the other items seized from the vehicle.

**DONE** and **ORDERED** this the **10th** day of **August 2011**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**